******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

KONOVER DEVELOPMENT CORPORATION *v.*
WATERBURY OMEGA, LLC
(AC 44537)

Alvord, Clark and Harper, Js.

*Syllabus*

The plaintiff, inter alia, sought to recover damages from the defendant
property owner for breach of contract. The parties had entered into an
oral management agreement for an unspecified term, pursuant to which
the plaintiff agreed to act as the defendant's exclusive agent for the
licensing of rooftop telecommunications equipment to be located at the
defendant's property in exchange for a percentage of the monthly
receipts generated by any licenses. The plaintiff procured two contracts
for the placement of wireless telecommunications equipment on top of
the building on the property and collected the commissions due in
connection therewith for approximately eleven years. Thereafter, the
defendant only intermittently remitted the commissions to the plaintiff.
Additionally, unbeknownst to the plaintiff, the defendant had entered
into similar contracts for the placement of wireless telecommunications
equipment on the building with three other parties and had not remitted
any commissions to the plaintiff in connection with those contracts.
After commencing this action, the plaintiff filed an application for a
prejudgment remedy, inter alia, to secure an amount equal to the
amounts allegedly due to it with respect to the two original contracts
and with respect to the commissions that it should have received in
connection with the three additional contracts. In response, the defen-
dant asserted special defenses, including that the plaintiff had violated
the applicable statute (§ 20-325a), which barred the recovery of certain
real estate commissions, and that enforcement of the oral management
agreement was barred by the statute of frauds and the rule against
perpetuities. The trial court granted the plaintiff's application for a
prejudgment remedy with respect to its breach of contract count,
determining that the plaintiff had established probable cause that the
parties had entered into a valid and enforceable oral management agree-
ment and that the defendant had breached that agreement by failing to
remit to the plaintiff the commissions relating to the three additional
contracts, and the defendant appealed to this court. *Held*:

1. The trial court properly rejected the defendant's special defense that the
plaintiff's claims were barred by § 20-325a because the plaintiff was
exempt from its prerequisites pursuant to the applicable statute (§ 20-
329 (9)), which provided an exception for leases or licenses of space
on buildings for unattended personal wireless services facilities, related
devices, and ancillary equipment used to operate such devices in an
area not to exceed 360 square feet for any one service: it was not
improper for the trial court to rely on the testimony of the plaintiff's
expert, A, in determining the meaning of the language of the § 20-329
(9) exception because, pursuant to the applicable statute (§ 1-1 (a)), the
undefined, technical statutory terms relating to the calculation of the
square footage requirement of the exception were to be accorded the
meaning that they would convey to an informed person in the applicable
field, and, having worked in the wireless industry for nineteen years, A
was an informed person in the applicable field; moreover, the defendant's
argument that the definitions contained in the applicable federal statute
(47 U.S.C. § 332) and regulation (47 C.F.R. § 1.6002) required the conclu-
sion that the space occupied by antennas must be included within the
square footage calculation for purposes of determining the applicability
of the exception was unavailing because those definitions did not relate
to measurement; furthermore, the defendant's proposed construction
of the exception, which would limit its applicability to a single wireless
facility, was unreasonable because it ignored the context of the phrase
at issue, which suggested that the square footage limitation applied to
each such facility; additionally, the defendant's argument that A improp-
erly added together the square footage of certain components of the
installation, rather than measuring the entire area in which the compo-

nents were contained, was unavailing.

2. The trial court properly determined that the defendant's defense with respect to the rule against perpetuities did not defeat the finding of probable cause because such rule concerned only the rights to property, the oral management agreement did not create or transfer any right in property, and the plaintiff did not claim any interest in the defendant's property.

3. The trial court properly determined that the defendant's defense with respect to the statute of frauds did not defeat the finding of probable cause: the defendant's argument that the oral management agreement was unenforceable pursuant to statute (§ 52-550 (a) (4)) because the plaintiff's claims concerned real property was unavailing because the trial court correctly determined that the agreement was for services and did not confer any rights to an interest in real property; moreover, the defendant's argument that the oral management agreement was unenforceable pursuant to § 52-550 (a) (5) because it was not to be performed within one year from the making thereof was also unavailing because the trial court determined that the agreement was one of indefinite duration, and, accordingly, it was outside of the proscriptive force of § 52-550 (a) (5) regardless of how long it would actually take to complete performance.

Argued March 1—officially released August 30, 2022

*Procedural History*

Action to recover damages for breach of contract, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the court, *Noble, J.*, granted the plaintiff's application for a prejudgment remedy, from which the named defendant appealed and the plaintiff cross appealed to this court; thereafter, the plaintiff withdrew its cross appeal. *Affirmed.*

*Richard P. Weinstein*, with whom, on the brief, was *Sarah Black Lingenheld*, for the appellant (named defendant).

*Richard F. Wareing*, with whom were *Angela M. Vickery* and, on the brief, *Anthony J. Natale*, for the appellee (plaintiff).

*Opinion*

ALVORD, J. The defendant Waterbury Omega, LLC[1] appeals from the judgment of the trial court granting the application for a prejudgment remedy in favor of the plaintiff, Konover Development Corporation, upon a finding of probable cause that the defendant had breached an oral agreement for the plaintiff's procurement, management and accounting of building/rooftop wireless telecommunications agreements on behalf of the defendant. On appeal, the defendant claims that the court improperly concluded that the plaintiff had established probable cause in light of its defenses that enforcement of the oral agreement was barred by (1) General Statutes § 20-325a, (2) the rule against perpetuities, and (3) the statute of frauds. We affirm the judgment of the court.

The court found the following facts, which are undisputed.[2] "[The defendant] is the owner of property located at 330 Bishop Street, Waterbury (property), on which is present a multistory building (building). In 2005, [the parties] entered into an oral contract, for no specified term, in which [the plaintiff] agreed to act as the property's exclusive telecommunications managing agent for the licensing of rooftop telecommunication[s] equipment including antennas ([oral management] agreement).[3] Pursuant to the terms of the [oral management] agreement, [the plaintiff] was to market, license and collect usage payments in exchange for a commission of 30 percent of monthly receipts generated by any license.

"In 2005, [the plaintiff] procured two contracts for the placement of wireless telecommunications equipment on the building's rooftop [collectively, the two original leases]. The first was dated March 3, 2005, with Nextel Communications of Mid-Atlantic, Inc. [(Nextel), later Sprint] and the second was dated July 20, 2005, with New Cingular Wireless PCS, LLC [(New Cingular), later AT&T] . . . . In the two original leases, [the defendant] acknowledged that '[the plaintiff] has been appointed as [the defendant's] telecommunications managing agent[4] for the [p]roperty and is compensated by [the defendant] based on a percentage of the revenue generated by this [l]ease and any future telecommunications leases pertaining to the [p]roperty.' [The plaintiff] was identified specifically as the third-party beneficiary of the two [original leases], each identified as an 'Antenna Facility Lease.' The [two original leases] differed, pertinently, in that the contract with New Cingular included an equipment shelter adjacent to the building on the ground. . . .

"Unbeknownst to [the plaintiff], [the defendant] entered into additional, similar [building/rooftop wireless telecommunications agreements], with [Omnipoint Communications, Inc., now known as T-Mobile (Omni-

point)] in 2006, with [Youghiogheny Communications-Northeast, LLC, doing business as Pocket Communications (Pocket)] in 2009 and with [Cellco Partnership, doing business as Verizon Wireless (Verizon)] in 2015. At no time did [the defendant] pay [the plaintiff] a commission for these additional contracts.[5] From 2005 through 2016, [the plaintiff], without interruption, collected the rent from the two original leases, remitted 70 percent to [the defendant] and reserved for itself the 30 percent commission. In August of 2016, [the defendant] began to collect the monthly payments for the two original leases as a consequence of a freeze on [the plaintiff's] banking account that prevented [the plaintiff] from issuing payments from its bank. Thereafter, between August of 2016 and February of 2018, [the defendant] only intermittently remitted the 30 percent commission from the two original leases to [the plaintiff]. Repeated communications between [Matthew Guglielmo, an agent of the plaintiff] and [the defendant's] representatives took place, in which payment of the commissions was requested. The present action was commenced on April 9, 2018. Ultimately, the commissions due pursuant to the two original leases were paid through April of 2018. No further payment has been made." (Footnotes in original.)

The following procedural history is also relevant. The plaintiff commenced this action in April, 2018, by way of a complaint seeking a declaratory judgment. In the complaint, the plaintiff alleged that the defendant had made required payments "only under the threat of legal action and only after counsel was engaged for both parties . . . ." The plaintiff alleged that the defendant had "repudiated its obligations under the [two original] leases." The plaintiff additionally alleged that, "[g]iven [the defendant's] repudiation of the parties' [oral management] agreement, there is an actual bona fide and substantial question or issue in dispute, which requires settlement between the parties."

The plaintiff filed its third amended complaint in August, 2019.[6] In the nine count complaint, the plaintiff alleged, inter alia, that the defendant had "not made any payments to [the plaintiff] since April of 2018." The defendant filed an answer and asserted several special defenses, including that the plaintiff had violated § 20-325a and that enforcement of the oral management agreement was barred by the statute of frauds and the rule against perpetuities.

On August 2, 2019, the plaintiff filed an application for a prejudgment remedy to "secure the sum of at least $351,184," which was accompanied by an affidavit of the plaintiff's president, Michael Konover.[7] The court, *Noble, J.*, held a hearing on the application on August 20 and 21, 2020. The court heard the testimony of Guglielmo, an agent of the plaintiff; Brian Allen, a wireless and telecommunications consultant/expert for the

plaintiff; and Moishe Schwartz, a member of the defendant.

The parties filed posthearing briefs. The defendant argued therein: "First, the plaintiff's claims are barred by [§] 20-325a because [General Statutes §] 20-329 (9) provides that [§] 20-325a is applicable and there can be no dispute that the plaintiff did not have a written agreement with [the defendant] that would fulfill the requirements of such statute. Second, considering that the plaintiff claims the purported oral management agreement is perpetual (and in fact is seeking an order that it is entitled to a percentage of revenue from *any future* telecommunications agreements), enforcement of the purported oral management agreement is barred by the rule against perpetuities. Finally, the purported oral management agreement is unenforceable pursuant to the statute of frauds because the terms put forth by the plaintiff (even if they could be proven) are inconsistent with completion of the agreement within one year such that the statute of frauds requires a written agreement. Because all of the plaintiff's claims (regardless of the cause of action) are barred as a matter of law by [§] 20-325a, the rule against perpetuities, and/or the statute of frauds, the plaintiff is not entitled to a prejudgment remedy even under the more lenient 'probable cause' standard applicable thereto." (Emphasis in original.) The plaintiff argued that the defendant's special defenses with respect to § 20-325a and the statute of frauds both failed and that the trial court already had rejected the defendant's special defense regarding the rule against perpetuities in its memorandum of decision denying the parties' cross motions for summary judgment.[8]

In its February 9, 2021 memorandum of decision, the court granted the application for a prejudgment remedy on the plaintiff's breach of contract count. The court determined that the plaintiff had "proven probable cause that the parties entered into a valid and enforceable oral agreement for [the plaintiff] to provide the exclusive marketing, licensing and management of accounts for the placement of wireless telecommunication[s] equipment on the property and building in exchange for payment of 30 percent of monthly receipts therefrom. [The plaintiff] has also proved that the [oral management agreement] was breached by [the defendant's] failure to remit the contracted for commission from the subsequently obtained agreements with Omnipoint, Pocket, and Verizon." The court expressly considered and rejected the defendant's special defenses, concluding that § 20-325a, the rule against perpetuities, and the statute of frauds did not bar the plaintiff's action.

The court then turned to the question of the amount of damages that had been established by probable cause. The court rejected the plaintiff's contention that it was entitled to recover not only past damages but

also "future damages extending throughout the life of the Omnipoint, Verizon, and Pocket agreements." The court determined that the oral management agreement, which was of indefinite duration, was terminable at will and found that it was terminated by the defendant no later than April, 2018. The court noted that it had been presented with "no evidence of an express termination" but had determined that termination was evident "by the conduct of [the defendant] inconsistent with its perpetuation." The court found that "[n]o payments of any sort have been made by [the defendant] since April of 2018, the date this action was commenced, and there was no evidence received to indicate that [the defendant] asked [the plaintiff] to perform any obligations under the [oral management] agreement, all indicative of an implicit termination of the [oral management] agreement."

The court found that the plaintiff had proven probable cause that it would recover damages based on its breach of contract claim[9] in the amount of $107,400.07, which amount consisted of payments made to the defendant from Omnipoint, Verizon, and Pocket through March 31, 2018, in the amount of $354,007.26, multiplied by the commission rate of 30 percent. The court found that no commissions were due for the two original leases because they were paid through April, 2018. Accordingly, the court ordered that the plaintiff may attach the assets of the defendant in the amount of $107,400.07. This appeal followed. On the same day that the appeal was commenced, the plaintiff filed a motion to reargue, reconsider, or correct the judgment, alleging an error in the computation of damages, and the defendant and Schwartz filed an objection. The court granted the motion and corrected its previous order to reflect that the plaintiff may attach the defendant's assets in the amount of $157,075.96.

Before turning to the claims on appeal, we first set forth the law governing prejudgment remedies and our limited role on review. "A prejudgment remedy means any remedy or combination of remedies that enables a person by way of attachment, foreign attachment, garnishment or replevin to deprive the defendant in a civil action of, or affect the use, possession or enjoyment by such defendant of, his property prior to final judgment . . . . General Statutes § 52-278a (d). A prejudgment remedy is available upon a finding by the court that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff . . . . General Statutes § 52-278d (a) (1). . . . Proof of probable cause as a condition of obtaining a prejudgment remedy is not as demanding as proof by a fair preponderance of the evidence. . . . The legal idea of probable cause is a bona fide belief

in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. . . . Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false. . . . Under this standard, the trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits." (Citations omitted; internal quotation marks omitted.) *TES Franchising, LLC* v. *Feldman*, 286 Conn. 132, 136–37, 943 A.2d 406 (2008).

"Section 52-278d (a) explicitly requires that a trial court's determination of probable cause in granting a prejudgment remedy include the court's *taking into account* any defenses, counterclaims or set-offs . . . . Therefore, it is well settled that, in determining whether to grant a prejudgment remedy, the trial court must evaluate both parties' evidence as well as any defenses, counterclaims and setoffs. . . . Such consideration is significant because a valid defense has the ability to defeat a finding of probable cause." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 141.

As for our standard of review, our Supreme Court has stated that an appellate "court's role on review of the granting of a prejudgment remedy is very circumscribed. . . . In its determination of probable cause, the trial court is vested with broad discretion which is not to be overruled in the absence of clear error. . . . Since *Augeri* [v. *C. F. Wooding Co.*, 173 Conn. 426, 429, 378 A.2d 538 (1977)] . . . we have consistently enunciated our standard of review in these matters. In the absence of clear error, this court should not overrule the thoughtful decision of the trial court, which has had an opportunity to assess the legal issues which may be raised and to weigh the credibility of at least some of the witnesses. . . . [On appeal], therefore, we need only decide whether the trial court's conclusions were reasonable under the clear error standard." (Citations omitted; internal quotation marks omitted.) *TES Franchising, LLC* v. *Feldman*, supra, 286 Conn. 137–38. Additionally, "we do not conduct a plenary review of the merits of defenses . . . raised, but rather our review is confined to a determination of whether the trial court's finding of probable cause constitutes clear error." Id., 140 n.8.

I

We first consider the defendant's claim on appeal related to the court's rejection of its special defense that the plaintiff's action was barred for its failure to satisfy the requirements contained in § 20-325a. Specifically, § 20-325a bars the recovery of real estate commissions unless certain requirements are satisfied, including the requirement that the agreement be in writing.

Section 20-329, however, provides exceptions to the bar against the recovery of commissions imposed by § 20-325a. Specifically, § 20-329 (9) (A) provides an exception for leases or licenses of space on buildings of unattended " 'personal wireless services facilities,' " related devices and "ancillary equipment used to operate such devices and equipment shelters therefor, in an area not to exceed [360] square feet for any one service . . . ." The defendant claims that the court improperly determined that the exception set forth in § 20-329 (9) applies and, therefore, that the plaintiff's action is not barred by § 20-325a. We agree with the trial court that the plaintiff was exempt, pursuant to § 20-329 (9), from the prerequisites set forth in § 20-325a. Accordingly, we conclude that the court properly rejected the defendant's special defense.

The following procedural history is relevant. At the hearing on the plaintiff's application for a prejudgment remedy, the plaintiff introduced the testimony of Allen, a wireless and telecommunications consultant/expert. Allen testified, inter alia, as to his physical examination and measurement of the wireless installations at the property. He further testified as to the industry standard in measuring wireless installations. He testified that each of the installations at issue were less than 360 square feet.

As background, Allen testified as to the components of a wireless installation. Specifically, he testified: "Essentially, the cell tower consists of equipment— which they may refer to as either ground equipment or rooftop equipment—that's placed either in a concrete bunker or a metal bunker or placed on a concrete pad. It would have things that look like refrigerators, which are called equipment cabinets, or it could be in a room in the basement of a building or on the top floor of a building or it could be placed on a metal platform on the roof. So those are just four examples of where the base station equipment would be, or ground equipment, or equipment room or equipment shelter, they're all synonymous. And then they would have antennas, which would be located high in the air, so they can provide coverage. And along with the antennas they may have little boxes."

Allen further testified as to which components of a wireless installation typically and customarily are considered for purposes of calculating the square footage of the installation. He testified that landlords and tenants "consider the ground equipment or base station equipment, which would consist of radio cabinets and various other ancillary cabinets, like a power cabinet or a telephone cabinet, and those are all contained on either the concrete pad or within the concrete building or on top of the platform on the roof or in the room, the equipment room in the basement or top floor of a building."

Allen testified that they do not "count the antennas," "the wires that connect the antennas to the equipment," or cable trays and explained why the industry custom and practice is to exclude these items from the computation of square footage.[10] Allen testified that antennas are separately enumerated in wireless agreements. For example, the Verizon agreement states that the defendant would provide "approximately [40] square feet of space . . . and approximately [170] square feet on the roof" for its wireless installation. The agreement also provides for "such additional space on the roof of the [b]uilding" for the installation of antennas, which are identified in exhibit B to the Verizon agreement only by the number of antennas. Allen explained: "[I]n exhibit B, it shows two sections of the roof and says 'proposed . . . lessee alpha sector panel antennas typical total of four mounted within proposed concealment tubes atop building roof,' and it has another section where it refers to beta [sector panel antennas] with another four. So they have rights to eight antennas." With respect to the Nextel antennas, Allen testified that they were "facade mounted," meaning that the antennas "hang on the side of the penthouse like a picture hanging on the wall."

Allen explained that "cable trays on a rooftop site serve to cover the cables so the landlord can walk on the roof or walk on top of it or . . . [t]hey can put other wires on top and we don't damage the wires for AT&T or Verizon or whoever." For example, Allen testified with respect to the Omnipoint installation that "[a]ll the wires were contained underneath the platform" and that "there were cable trays for Verizon and AT&T underneath the Omnipoint . . . equipment."

With respect to wires, Allen testified that, "[i]n the lease, we don't count the square footage of wires because wires don't have square footage." He also testified that "the lease is always silent on . . . wires because the landlord has the ability to control the location of the equipment shelter." Specifically, Allen testified that, had the Nextel shelter been located on the roof, the wires would have been attached in a similar manner as the Omnipoint installation. Allen testified, however, that Nextel was "forced to go on the ground, so now they have some wires." Thus, Allen did not measure the wires running from the roof to the equipment shelter located on the ground.

In its memorandum of decision, the court expressly credited Allen's testimony in determining that the plaintiff had "proven probable cause that the building/rooftop wireless telecommunications agreements at issue were for unattended personal wireless services facilities, related services and ancillary equipment that did not exceed 360 square feet for any one service." Accordingly, the court concluded that the exception set forth in § 20-329 (9) applies, and, therefore, the plaintiff's action is not barred by § 20-325a.[11]

We first set forth the relevant statutes. Pursuant to § 20-325a, a licensed real estate broker or salesperson may not institute an action to recover "any commission, compensation or other payment" unless such broker or salesperson acted pursuant to a written agreement.[12] Section 20-329 provides in relevant part: "The provisions of this chapter concerning the licensure of real estate brokers and real estate salespersons shall not apply to . . . (9) any person or such person's regular employee who, as owner, lessor, licensor, manager, representative or agent manages, leases, or licenses space on or in a tower, building or other structure for (A) 'personal wireless services facilities' or facilities for 'private mobile service' as those terms are defined in 47 USC 332, which facilities shall be unattended, and the installation and maintenance of related devices authorized by the Federal Communications Commission, and ancillary equipment used to operate such devices and equipment shelters therefor, in an area not to exceed [360] square feet for any one service established by the Federal Communications Commission in 47 CFR, as amended from time to time, by a provider of any such service, and (B) any right appropriate to access such facilities and connect or use utilities in connection with such facilities."

Analysis of the defendant's claim requires us to construe § 20-329 (9). Ordinarily, we review a trial court's actions with respect to an application for a prejudgment remedy for clear error. "In this case, however, the issue raised by the defendant presents a question of statutory interpretation requiring plenary review. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Citation omitted; internal quotation marks omitted.) *A1Z7, LLC* v. *Dombek*, 188 Conn. App. 714, 718–19, 205 A.3d 740 (2019).

We first consider the defendant's two related arguments with respect to the admission of Allen's testimony as to the meaning of the statutory phrases "related devices" and "ancillary equipment used to operate such devices and equipment shelters therefor"; General Statutes § 20-329 (9) (A); as used in the wireless telecommunications industry. First, the defendant argues that Allen's testimony improperly contravened the plain lan-

guage of the statute and that "a purported 'industry standard' cannot be used to override and undermine express statutory terms." Second, the defendant argues that Allen's testimony was irrelevant because "[t]he legislature, in dealing with its policy determination to except certain functions from licensing requirements, is not dealing with a telecommunications issue that requires expert testimony, but a consumer protection issue." We disagree with both arguments and conclude that the court properly admitted into evidence and relied on Allen's testimony in construing the statutory language.

We note that the terms "related devices," "ancillary equipment," and "equipment shelters" are not defined in the statute. See General Statutes § 20-329. In the absence of a statutory definition, we turn to General Statutes § 1-1 (a), which provides: "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." Our appellate courts have stated that "[t]echnical terms can be legal terms as well as terms associated with the trade or business with which a given statute is concerned, and the terms in question should be accorded the meaning which they would convey to an informed person in the [applicable] trade or business." (Internal quotation marks omitted.) *Shoreline Shellfish, LLC* v. *Branford*, 336 Conn. 403, 411, 246 A.3d 470 (2020); see also *Berger, Lehman Associates, Inc.* v. *State*, 178 Conn. 352, 355–57, 422 A.2d 268 (1979) (word "design," which was not defined in statute waiving sovereign immunity for actions against state pursuant to contracts for design of public works, would be read by persons in field of engineering, who would "read the statute's words in their engineering sense," and trial court "concluded that the word 'design' has, in the engineer's lexicon, the same narrow definition" our Supreme Court determined using dictionary); *Manchester* v. *Manchester Police Union, Local 1495, Council 15, AFSCME*, 3 Conn. App. 1, 9, 484 A.2d 455 (1984) (phrase " 'normal retirement age,' while not having a universally accepted definition, does have a commonly accepted meaning which it would convey to an informed person in the pension field" and such understanding is relevant to informing court's determination of meaning of synonymous and undefined statutory phrase, " 'normal retirement date' ").

The defendant's arguments also implicate the standard for admissibility of expert testimony. Section 7-2 of the Connecticut Code of Evidence provides: "A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will

assist the trier of fact in understanding the evidence or in determining a fact in issue." "It is well settled that [t]he true test of the admissibility of [expert] testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter; but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue. . . . Implicit in this standard is the requirement . . . that the expert's knowledge or experience must be directly applicable to the matter specifically in issue." (Citations omitted; internal quotation marks omitted.) *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 158–59, 971 A.2d 676 (2009). "The court's decision [as to the admissibility of an expert's opinion] is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law." (Internal quotation marks omitted.) *Caciopoli* v. *Lebowitz*, 131 Conn. App. 306, 322, 26 A.3d 136 (2011), aff'd, 309 Conn. 62, 68 A.3d 1150 (2013).

In the present case, the court was called on to construe and apply the undefined, technical terms present in the statute, and, pursuant to § 1-1 (a), the terms were to be accorded the meaning that they would convey to an informed person in the applicable trade.[13] It was reasonable for the court to accept Allen, who had worked in the wireless industry for nineteen years, as an informed person in the applicable trade. Thus, Allen's testimony as to the wireless industry's custom and practice appropriately aided the court in determining the meaning of the technical terms within the statute, and the defendant has not shown that the court abused its discretion. Accordingly, we conclude that it was not improper for the court to rely on Allen's testimony in determining the meaning of the statutory language.

Having determined that the court did not abuse its discretion in admitting and relying on Allen's testimony, we turn to the defendant's arguments concerning the court's interpretation of the statute. The defendant points to federal law to support its argument that "the area occupied by any antennas and any equipment, switches, wiring, cabling, power sources, shelters, or cabinets associated with an antenna must be included in the square footage calculation of 'personal wireless services facilities' set forth in [§] 20-329 (9)." The defendant argues that "[t]he [federal] statutory definition of 'antennas' and other related terms, makes clear that they are a component of 'personal wireless services facilities' and thus would be required to be included in any square footage calculation under [§] 20-329 (9)." The defendant directs this court's attention to 47 U.S.C. § 332 (c) (7) (C), which defines " 'personal wireless service facilities' " as "facilities for the provision of

personal wireless services" and " 'personal wireless services' " as "commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services . . . ." The defendant emphasizes that 47 U.S.C. § 332 contains additional definitions of services and equipment, which it contends "advances the point that these facilities each contain multiple components that are required for the facilities to function."[14] The defendant further points to title 47 of the Code of Federal Regulations, § 1.6002 (b), which provides that "[a]ntenna, consistent with § 1.1320 (d), means an apparatus designed for the purpose of emitting radiofrequency (RF) radiation, to be operated or operating from a fixed location pursuant to Commission authorization, for the provision of personal wireless service and any commingled information services. For purposes of this definition, the term antenna does not include an unintentional radiator, mobile station, or device authorized under part 15 of this chapter." The defendant also relies on the additional definitions of "antenna equipment," "antenna facility," and "facility"[15] as demonstrating that "the terms are components of, and not merely ancillary to, personal wireless service facilities" and, thus, the area occupied by such components must be included in the square footage calculation pursuant to § 20-329 (9).

We disagree with the defendant that the definitions contained within 47 U.S.C. § 332 and the Code of Federal Regulations necessitate a conclusion that the space occupied by antennas is required to be included within the square footage calculation for purposes of § 20-329 (9). Section 20-329 (9) (A) refers to 47 U.S.C. § 332 for its definitions of the terms " 'personal wireless services facilities' " and facilities for " 'private mobile service' . . . ." Neither of those definitions, however, relates to the measurement of any physical structures. Moreover, the reference contained in § 20-329 (9) (A) to title 47 of the Code of Federal Regulations is to "any one service" as established by the Federal Communications Commission in the federal regulations. Again, the reference to the federal regulations does not relate to measurement. Thus, we reject the defendant's challenge rooted in the federal definitions.

We find persuasive the plaintiff's contention in its appellate brief that Allen's testimony was consistent with the building/rooftop wireless telecommunications agreements. For example, the Omnipoint agreement indicated a "proposed 15' x 15' lease area and equipment platform," and the antenna was not included within that area. The Nextel agreement indicated an equipment shelter measuring twelve feet by twenty feet located on the roof. Similarly, the Verizon agreement states that the defendant would provide "approximately [40] square feet of space . . . and approximately [170] square feet on the roof" for its wireless installation and separately enumerates the number of antennas. The

New Cingular agreement indicates a proposed equipment shelter measuring twelve feet by twenty feet. As to Pocket, Allen testified that the lease did not give an indication of the size of the installation at the property, and there was no installation at the property when Allen visited. However, Allen previously had worked as a leasing agent for Pocket and testified that Pocket "typically leased for a small concrete pad, at least six feet by ten feet at a maximum."

The defendant next argues that the court improperly failed to acknowledge that § 20-329 (9) "provides for an exception for a single wireless facility while there are multiple wireless facilities at issue here." The defendant contends that the phrase "for any one service" contained in § 20-329 (9) logically "refers to the role of the broker (i.e., the person that the statutory scheme seeks to regulate) such that a person acting in such role 'for any one service' is exempted from licensing requirements while a person acting in such role for multiple providers is not."

We disagree with the defendant's proposed construction, which is unreasonable in that it wholly ignores the context of the phrase at issue. The larger clause provides in relevant part: "[I]n an area not to exceed [360] square feet for any one service established by the Federal Communications Commission . . . by a provider of any such service . . . ." General Statutes § 20-329 (9) (A). Thus, the logical reading of this phrase is that the 360 square foot limitation applies to each "service established by the Federal Communications Commission . . . ." General Statutes § 20-329 (9) (A). "We will not torture the words or sentence structure of a statute to import an ambiguity where the ordinary meaning of the language leaves no room for it." (Internal quotation marks omitted.) *Mosby* v. *Board of Education*, 191 Conn. App. 280, 286, 214 A.3d 400 (2019), cert. denied, 335 Conn. 939, 237 A.3d 1 (2020). Accordingly, we reject the defendant's proposed interpretation.

The defendant's final argument is that the court improperly determined that the exception set forth in § 20-329 (9) applied because it failed to give meaning to the statutory language providing that the wireless facilities were required to be "in an area not to exceed [360] square feet . . . ." General Statutes § 20-329 (9) (A). The defendant contends that Allen improperly added together the square footage of certain components rather than measuring the area in which the components were contained. Specifically, the defendant points to the Verizon installation, which was comprised of a forty square foot generator on the ground and a seventy square foot equipment platform on the roof. The defendant poses the following question: "If one part of a wireless installation is 1000 feet from the other part, how can one say that the two parts are contained in an area of less than 360 square feet?" We are not

persuaded by the defendant's argument that, because certain components of the installation are separated between the ground and the roof, the installation cannot be considered to be within an area not to exceed 360 square feet.

Accordingly, we conclude that the court properly considered the defendant's special defense that the plaintiff's claims are barred by § 20-325a and properly determined that such defense did not defeat a finding of probable cause.

## II

The defendant's second claim on appeal is that the court improperly determined that enforcement of the oral management agreement is not barred by the rule against perpetuities.

The following additional procedural history is relevant to our resolution of this claim. In its memorandum of decision on the application for a prejudgment remedy, the court referenced its previous summary judgment decision as holding "that neither the common-law nor the statutory rules against perpetuities applied because the [oral management] agreement provided an immediate fixed right to a present or future enjoyment of a lease or license related contract." In the summary judgment decision, the court considered both the common-law and statutory rules, noting that both rules "implicate only interests that are not vested at the time of creation. Where a party has an immediate fixed right to a present or future enjoyment, the rule is inapplicable even where the right extends in apparent perpetuity." The court stated that, "[i]n the present case, whatever rights [the plaintiff] possessed vested upon execution of the agreements. Thus, neither the common-law [n]or statutory rule of perpetuit[ies] bars the present action."[16]

The defendant argues on appeal that only the common-law rule is applicable to the present case. The defendant argues that the plaintiff's rights vested not at the time of the oral management agreement, but when the defendant later entered into the building/rooftop wireless telecommunications agreements. According to the defendant, the plaintiff had no rights with respect to the defendant's property until the building/rooftop wireless telecommunications agreements came into existence, and the plaintiff's claim to a percentage of revenue from "any future telecommunications leases"; (emphasis omitted); is "just the sort of perpetual interest that the rule against perpetuities is intended to prevent." The plaintiff responds that the rule against perpetuities does not apply because the trial court's order with respect to the prejudgment remedy addressed only whether the plaintiff had shown probable cause that it could prove breach of contract under the oral management agreement. Because the oral management agree-

ment created no property rights in the plaintiff, the plaintiff contends that it is outside the scope of the rule against perpetuities.[17]

"The rule against perpetuities states that [n]o interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest." (Internal quotation marks omitted.) *Tolland Enterprises* v. *Commissioner of Transportation*, 36 Conn. App. 49, 53 n.2, 647 A.2d 1045 (1994). "The underlying and fundamental purpose of the common law rule against perpetuities is the protection of society by allowing full utilization of land. As commonly noted, [t]he rule [against perpetuities] evolved to prevent . . . property from being fettered with future interests so remote that the alienability of the land and its marketability would be impaired, preventing its full utilization for the benefit of society at large as well as of its current owners." (Internal quotation marks omitted.) Id., 54. "The rule against perpetuities concerns rights of property only, and does not affect the making of contracts which do not create rights of property." (Internal quotation marks omitted.) *H. J. Lewis Oyster Co.* v. *West*, 93 Conn. 518, 529, 107 A. 138 (1919); see also 61 Am. Jur. 2d 63, Perpetuities, Etc. § 53 (1981) (same); 70 C.J.S. 385–86, Perpetuities § 10 (2005) ("[t]he rule against perpetuities is a restriction on the right of the disposition of property, and is by far the most important restraint which the law places on the right to create future interests" (footnote omitted)).

In the present case, the oral management agreement at issue does not create or transfer any right in property, and the plaintiff does not claim any interest in the defendant's property.[18] The rights at issue are illustrated by the plaintiff's requested recovery, which is limited to the portion of the monthly rent it claims it was entitled to under the oral management agreement. The defendant has not directed this court to any authority supporting the applicability of the rule against perpetuities to the type of agreement at issue in the present case. Accordingly, we conclude that the court properly determined that the defendant's defense with respect to the rule against perpetuities did not defeat a finding of probable cause.

### III

The defendant's final claim on appeal is that the court improperly determined that the statute of frauds did not bar enforcement of the oral management agreement. First, it contends that General Statutes § 52-550 (a) (4) applies on the basis that the plaintiff's claims "concern real property . . . ." Second, it contends that "[t]he trial court also erroneously held that the statute of frauds did not apply because the [oral] management agreement was of indefinite duration and, thus, was not a contract not to be performed within one year." We examine each argument in turn.

The following additional facts and procedural history are relevant to our resolution of this claim. In its memorandum of decision on the application for a prejudgment remedy, the court concluded that the defendant's reliance on the statute of frauds as a special defense was unavailing. It stated that the defendant's "assertion, without citation to authority, that the [oral management] agreement falls within the purview of the statute of frauds because it is an agreement 'for any interest in or concerning real property,' ignores that what is at issue is an agreement for services that is not within the purview of § 52-550 (a) (4)." It next determined that § 52-550 (a) (5) likewise did not bar enforcement of the oral management agreement on the basis that the agreement is a contract of indefinite duration.

Section 52-550 (a) provides in relevant part: "No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . (4) upon any agreement for the sale of real property or any interest in or concerning real property; [or] (5) upon any agreement that is not to be performed within one year from the making thereof . . . ." "Under Connecticut law, the statute of frauds operates as a special defense to a civil action. . . . Its function is evidentiary, to prevent enforcement through fraud or perjury of contracts never in fact made." (Citation omitted; internal quotation marks omitted.) *Patrowicz* v. *Peloquin*, 190 Conn. App. 124, 138, 209 A.3d 1233, cert. denied, 333 Conn. 915, 216 A.3d 651 (2019). "The primary purpose of the statute of frauds is to provide reliable evidence of the existence and the terms of the contract . . . ." (Internal quotation marks omitted.) *Reid & Riege, P.C.* v. *Bulakites*, 132 Conn. App. 209, 217, 31 A.3d 406 (2011), cert. denied, 303 Conn. 926, 35 A.3d 1076 (2012).

The defendant first argues that the plaintiff claims an interest in the building/rooftop wireless telecommunications agreements, "as well as claiming an interest in any future agreements with any cellular providers. Because the cellular agreements convey an interest in land (albeit only as to a portion of the premises), the plaintiff's claims here concern real property and, thus, the statute of frauds applies pursuant to [§] 52-550 (a) (4)."

This argument is unpersuasive, as it is premised on the defendant's assertion that the plaintiff's claims "concern real property . . . ." In determining that the plaintiff had shown probable cause with respect to its breach of contract claim, the court correctly noted that the oral management agreement is one for services. Specifically, the court stated that, pursuant to the oral management agreement, the plaintiff was "to market, license and collect usage payments in exchange for a commission of 30 percent of monthly receipts generated by any

license." The oral management agreement did not confer on the plaintiff any rights to an interest in or concerning real property. See *Pagano* v. *Ippoliti*, 245 Conn. 640, 645, 647, 716 A.2d 848 (1998) (contract claims as formulated by plaintiff were for damages arising out of loss of financial, rather than real property, interests in development project, and, as such, contracts did not violate § 52-550 (a) (4)). Accordingly, we conclude that the court properly determined that the defendant's defense with respect to § 52-550 (a) (4) did not defeat a finding of probable cause.

With respect to the defendant's argument that the oral management agreement was unenforceable because it was not to be performed within one year from the making thereof; see General Statutes § 52-550 (a) (5); we conclude that the court properly relied on *C. R. Klewin, Inc.* v. *Flagship Properties, Inc.*, 220 Conn. 569, 583–84, 600 A.2d 772 (1991). In that case, our Supreme Court held that "an oral contract that does not say, in express terms, that performance is to have a specific duration beyond one year is, as a matter of law, the functional equivalent of a contract of indefinite duration for the purposes of the statute of frauds. Like a contract of indefinite duration, such a contract is enforceable because it is outside the proscriptive force of the statute regardless of how long completion of performance will actually take." Id.[19] In the present case, the court determined that the oral management agreement was of indefinite duration.[20] Accordingly, we conclude that the court properly determined that the defendant's defense with respect to § 52-550 (a) (5) did not defeat a finding of probable cause.

Therefore, we conclude that the court's finding of probable cause did not constitute clear error.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Moishe Schwartz, a member of Waterbury Omega, LLC, also is named as a defendant in this action. Schwartz is not participating in this appeal, and we therefore refer in this opinion to Waterbury Omega, LLC, as the defendant.

[2] The defendant states in its principal appellate brief that it is not contesting on appeal the existence of the oral management agreement. Its only claims on appeal relate to its contention that such agreement is unenforceable.

[3] "While the parties contemplated the execution of a written management contract, none of them were able to locate an executed copy."

[4] "The New Cingular lease provides that [the plaintiff] is the 'exclusive telecommunications managing agent' while the Nextel lease omits the word 'exclusive' and provides only that [the plaintiff] has been 'appointed as [the defendant's] telecommunications managing agent.' "

[5] "These three agreements and the [two original leases] are collectively referred to as the building/rooftop wireless telecommunication[s] agreements."

[6] The complaint subsequently has been amended twice more, and the defendant has filed an answer to the fifth amended complaint. The amendments do not affect this court's analysis with respect to the propriety of the prejudgment remedy on the plaintiff's breach of contract claim.

[7] In the affidavit accompanying the application for a prejudgment remedy, Konover averred: "The total amount that [the plaintiff] seeks in this prejudgment remedy is $351,184 in addition to reasonable attorney's fees. That number is based on (1) the 30 percent share that [the plaintiff] is entitled

to receive from the [two original leases] from May of 2018 through December of 2020, (2) the 30 percent share that [the plaintiff] would have received from the [agreements with Omnipoint and Verizon] from the date each such agreement became effective through December of 2020; and (3) simple interest at a rate of 10 percent per year through December of 2020, on all amounts [the plaintiff] would have received as set forth in (1) and (2)."

[8] In January, 2019, the defendant filed a motion for summary judgment, arguing that the plaintiff's claims were barred by § 20-325a on the basis that there was no written agreement between the parties. In April, 2019, the plaintiff filed a cross motion for summary judgment, arguing that the requirements in § 20-325a were not applicable because the building/rooftop wireless telecommunications agreements were licenses and not leases, that even if the agreements were considered leases, the exception contained in § 20-329 (9) applied, and that the rule against perpetuities did not bar the plaintiff's claims. On April 23, 2020, the court issued a memorandum of decision in which it denied both motions for summary judgment. The court determined that the agreements were not barred by the rule against perpetuities but found that there were genuine issues of material fact "as to whether the agreements [fell] within the exception articulated in § 20-329."

[9] The court determined that the plaintiff had not established probable cause that it would recover under a theory of negligent misrepresentation against the defendant or Schwartz. The plaintiff filed a cross appeal as to the denial, in part, of its application for a prejudgment remedy, but it subsequently withdrew the cross appeal.

[10] Allen also testified that radio heads typically are not counted toward square footage. He described a radio head as "a small box about half the size of a carry-on suitcase which works with the antennas. It's a new technology that came up after the leases existed." With respect to the New Cingular installation, Allen testified: "I measured the RRUs, which are remote radio heads; they sat on ballast mounted sleds on the roof. They're typically not counted because they're considered antenna articles. So I measured them because they were there, but I would not have counted them in the lease. If you go into the lease documents, there's a consent letter that allows for the placement of them there, which has no reference to any square footage that they take up, just that they exist." Allen testified generally that even when including radio heads in his square footage calculation, each installation still occupied less than 360 square feet.

[11] In its appellate brief, the plaintiff contends that the defendant's claim regarding the applicability of § 20-329 (9) is moot because it challenged only one of two independent bases for the court's determination that § 20-325a was inapplicable. Specifically, the plaintiff maintains that the court's decision rested on two separate bases: (1) that the plaintiff's action was not barred by § 20-325a because the building/rooftop wireless telecommunications agreements at issue relate to licenses rather than interests in real estate, and (2) that if § 20-325a applies, the exception contained in § 20-329 (9) also applies. We disagree with this construction of the court's decision.

In its memorandum of decision on the application for a prejudgment remedy, the court referenced its decision on the parties' cross motions for summary judgment; see footnote 8 of this opinion; and stated: "In brief, the court concluded, therein, that the plaintiff's action is not barred by § 20-325a because the agreements at issue relate to licenses, an interest that is not an 'estate' or an 'interest in real estate,' which are the objects of that statute. . . . Moreover . . . § 20-329 (9) expressly provides an exception to the bar imposed by § 20-325a for leases or licenses of space on buildings of unattended 'personal wireless services facilities,' related devices and ancillary equipment, including equipment shelters in an area not to exceed 360 square feet for any one service. In the [summary judgment] decision, the court found a question of material fact existed as to the size of the facilities, devices and ancillary equipment involved. . . . As of the [prejudgment remedy] application, however, the court credits the testimony of Allen and finds that [the plaintiff] has proven probable cause that the building/rooftop wireless telecommunications agreements at issue were for unattended personal wireless services facilities, related services and ancillary equipment that did not exceed 360 square feet for any one service. Accordingly, § 20-325a does not bar this action." (Citations omitted; footnote omitted.)

We do not construe the court's reference to its prior decision as constituting an independent basis for its decision on the application for a prejudgment remedy. Accordingly, we reject the plaintiff's contention that the defendant's claim is moot.

[12] General Statutes § 20-325a provides in relevant part: "(b) No person, licensed under the provisions of this chapter, shall commence or bring any action with respect to any acts done or services rendered . . . as set forth in subsection (a), unless the acts or services were rendered pursuant to a contract or authorization from the person for whom the acts were done or services rendered. To satisfy the requirements of this subsection any contract or authorization shall: (1) Be in writing, (2) contain the names and addresses of the real estate broker performing the services and the name of the person or persons for whom the acts were done or services rendered, (3) show the date on which such contract was entered into or such authorization given, (4) contain the conditions of such contract or authorization, (5) be signed by the real estate broker or the real estate broker's authorized agent, (6) if such contract or authorization pertains to any real property, include the following statement: 'THE REAL ESTATE BROKER MAY BE ENTITLED TO CERTAIN LIEN RIGHTS PURSUANT TO SECTION 20-325a OF THE CONNECTICUT GENERAL STATUTES', and (7) be signed by the person or persons for whom the acts were done or services rendered or by an agent authorized to act on behalf of such person or persons . . . ."

[13] We note that the defendant does not argue broadly on appeal that expert testimony is inadmissible generally to aid the court in defining technical terms contained within statutes, and courts in other jurisdictions have recognized that "[r]eliance on expert definitions of terms of art is a sound general rule of construction . . . ." (Internal quotation marks omitted.) *Shell Petroleum, Inc.* v. *United States*, 182 F.3d 212, 220 (3d Cir. 1999); see also *Dynacon, Inc.* v. *D & S Contracting, Inc.*, 120 N.M. 170, 177, 899 P.2d 613 (1995) (recognizing that "interpretation of technical language in a statute can and should be informed by evidence concerning how those technical terms are interpreted by experts in the pertinent field").

[14] The defendant cites the following definitions contained in 47 U.S.C. § 332 (d): "For purposes of this section—

"(1) the term 'commercial mobile service' means any mobile service (as defined in section 153 of this title) that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the Commission;

"(2) the term 'interconnected service' means service that is interconnected with the public switched network (as such terms are defined by regulation by the Commission) or service for which a request for interconnection is pending pursuant to subsection (c) (1) (B) . . . ."

The defendant also cites 47 U.S.C. § 153, which provides in relevant part: "For the purposes of this chapter, unless the context otherwise requires . . .

* * *

"(29) The term 'land station' means a station, other than a mobile station, used for radio communication with mobile stations.

* * *

"(33) The term 'mobile service' means a radio communication service carried on between mobile stations or receivers and land stations, and by mobile stations communicating among themselves, and includes (A) both one-way and two-way radio communication services, (B) a mobile service which provides a regularly interacting group of base, mobile, portable, and associated control and relay stations (whether licensed on an individual, cooperative, or multiple basis) for private one-way or two-way land mobile radio communications by eligible users over designated areas of operation, and (C) any service for which a license is required in a personal communications service established pursuant to the proceeding entitled 'Amendment to the Commission's Rules to Establish New Personal Communications Services' (GEN Docket No. 90-314; ET Docket No. 92-100), or any successor proceeding.

"(34) The term 'mobile station' means a radio-communication station capable of being moved and which ordinarily does move.

* * *

"(40) The term 'radio communication' or 'communication by radio' means the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission. . . ."

[15] Title 47 of the 2021 edition of the Code of Federal Regulations, § 1.6002, provides in relevant part: "(c) Antenna equipment, consistent with § 1.1320 (d), means equipment, switches, wiring, cabling, power sources, shelters or cabinets associated with an antenna, located at the same fixed location as

the antenna, and, when collocated on a structure, is mounted or installed at the same time as such antenna.

"(d) Antenna facility means an antenna and associated antenna equipment.

* * *

"(i) Facility or personal wireless service facility means an antenna facility or a structure that is used for the provision of personal wireless service, whether such service is provided on a stand-alone basis or commingled with other wireless communications services. . . ."

[16] In considering the rule against perpetuities at the summary judgment stage, the court's decision rested on its determination that the plaintiff's rights "vested upon execution of the agreements." As both parties recognize, the prejudgment remedy was limited to the plaintiff's claim of breach of the oral management agreement. Thus, the agreement under which the court determined that the plaintiff had vested rights in connection with the prejudgment remedy application is the oral management agreement.

[17] Although the trial court did not reject the defendant's special defense on this basis, we consider the plaintiff's argument on appeal because the defendant had an adequate opportunity to respond in its reply brief and because the argument was preserved in the trial court, where the plaintiff argued in posthearing briefing that the interest at issue constituted 30 percent of the revenue generated from the wireless providers at the property and did not concern any restraints on the alienation of property, and, thus, the rule against perpetuities did not apply.

Moreover, in rejecting the defendant's statute of frauds special defense, the court rejected the defendant's argument that the oral management agreement is an agreement " 'for any interest in or concerning real property' " and found that the agreement was one for services.

[18] When asked during oral argument before this court whether the plaintiff had taken the position before the trial court that the oral management agreement runs with the land, the plaintiff's counsel represented that it had not taken that position.

[19] Outside of a discussion of *C. R. Klewin, Inc.* v. *Flagship Properties, Inc.*, supra, 220 Conn. 583–84, the defendant's only citation to authority in support of its argument with respect to § 52-550 (a) (5) is to *Redgate* v. *Fairfield University*, 862 F. Supp. 724, 729–30 (D. Conn. 1994), in which the United States District Court for the District of Connecticut determined that a former employee's breach of contract claims did not meet the requirements of the statute of frauds when he allegedly had been assured employment for ten or twenty years. This decision is distinguishable on its facts.

[20] The defendant indirectly attacks the trial court's finding that the oral management agreement was of indefinite duration by asserting that its enforcement is barred by the statute of frauds because (1) an unsigned draft management agreement provided for a two year term with two, two year extensions; and (2) "the [building/rooftop wireless telecommunications] agreements as to which the plaintiff claims an interest all include express terms of more than one year." First, we do not find clear error in the court's determination that the oral management agreement was of indefinite duration on the basis of the terms of the unsigned draft agreement. "Weighing the evidence and judging the credibility of the witnesses is the function of the trier of fact and this court will not usurp that role." (Internal quotation marks omitted.) *TES Franchising, LLC* v. *Feldman*, supra, 286 Conn. 143. Second, the court expressly declined to address the plaintiff's contention that it was a third-party beneficiary under the two original leases. The court concluded only that the plaintiff had proven probable cause of recovery pursuant to the oral management agreement. Accordingly, we reject the defendant's statute of frauds arguments premised on the unsigned agreement and the two original leases.

———————————————