******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# KEREN PRESCOTT *v.* YULIYA GILSHTEYN
## (AC 46350)

Alvord, Seeley and Bear, Js.

*Syllabus*

The plaintiff filed an application for a prejudgment remedy and a verified complaint in which she sought to recover damages from the defendant for assault, battery, intentional infliction of emotional distress and intimidation based on bigotry or bias. The plaintiff, a Black woman who suffered from multiple sclerosis, was attending a protest at the Capitol building in January, 2021, in the midst of the COVID-19 pandemic, to demonstrate her support of the Black Lives Matter movement. The defendant, a white woman, approached the plaintiff and, inter alia, asked her about "Black on Black" crime. After a brief exchange of words between the parties, the defendant spat directly into the plaintiff's face. During the hearing on her application, the plaintiff, inter alia, introduced testimony from G, a professor of criminology and social justice, as an expert on issues related to racism and social justice. The trial court granted the application, and the defendant appealed to this court. *Held*:

1. The trial court did not err in awarding the plaintiff a prejudgment remedy of $75,000 in emotional distress damages; the plaintiff's testimony that she experienced severe emotional distress and humiliation as a result of being spat on, that the experience reawakened trauma of a past sexual assault, and that she had increased concerns that she might contract COVID-19, which could worsen her multiple sclerosis symptoms, afforded a reasonable basis for the prejudgment remedy.

2. The trial court did not abuse its discretion in admitting G's expert testimony: pursuant to the standard set forth in *Weaver* v. *McKnight* (313 Conn. 393) for the admission of nonscientific evidence, the court found that G had special knowledge that was directly applicable to the matter at issue, his testimony offered the court a historical and sociological perspective on race and racism that would not have been within the knowledge of the average person, and his testimony providing context for how the defendant's statements could be construed was helpful to the court in its determination of whether the defendant exhibited racial bigotry or bias; moreover, the defendant's challenges to the admission of G's testimony in part concerned the substance of G's testimony, which related to the weight his testimony should be given and not its admissibility.

3. This court concluded that there was sufficient evidence before the trial court to support its determination that there was probable cause to believe that the defendant's actions and/or statements were motivated in whole or substantial part by the plaintiff's race: G's testimony, which was properly admitted and was credited by the trial court, explained

how some of the defendant's language could be interpreted as racist tropes indicating a racist attitude; moreover, the trial court reasonably could have determined that a person of ordinary judgment could conclude that the white defendant's conduct in spitting on the Black plaintiff was motivated in substantial part by race, as evidence showed that the defendant moved toward the plaintiff after the plaintiff began chanting, "Black lives matter," stood directly next to the plaintiff, and used the phrases "Black on Black" crime and "all lives matter," which could suggest the defendant had a level of racial animus.

4. The defendant could not prevail on her unpreserved claim that the trial court committed plain error in granting the plaintiff's application for a prejudgment remedy in a case involving freedom of speech and first amendment principles: this case involved allegations against the defendant for her conduct in spitting on the plaintiff, not for making a verbal threat, and the court used the defendant's statements made just prior to the spitting incident solely to help determine her intent and whether she was motivated in whole or part by the plaintiff's race; moreover, the defendant did not demonstrate that the claimed error was so clear, obvious, and indisputable as to warrant the extraordinary remedy of reversal, as there are no exceptions within the statutes (§§ 52-278c and 52-278d) governing prejudgment remedies for cases involving first amendment principles.

Argued February 6—officially released August 20, 2024

*Procedural History*

Action to recover damages for, inter alia, intimidation based on bigotry or bias, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the court, *Budzik, J.*, granted the plaintiff's application for a prejudgment remedy, and the defendant appealed to this court. *Affirmed.*

*Norman A. Pattis*, for the appellant (defendant).

*Kenneth J. Krayeske*, for the appellee (plaintiff).

*Opinion*

SEELEY, J. The defendant, Yuliya Gilshteyn, appeals from the judgment of the trial court granting the application for a prejudgment remedy filed by the plaintiff, Keren Prescott, upon findings of probable cause that the defendant committed a civil assault and battery against the plaintiff, that the defendant intentionally

inflicted emotional distress on the plaintiff, that the defendant maliciously and intentionally harassed and intimidated the plaintiff by spitting in the plaintiff's face and that her actions in doing so were motivated, in whole or in substantial part, by the plaintiff's race. On appeal, the defendant claims that the court (1) improperly determined that the plaintiff was entitled to a prejudgment remedy in the amount of $295,239.60, (2) abused its discretion in permitting testimony from the plaintiff's expert concerning the racist import of certain statements made by the defendant, and (3) committed plain error in granting the plaintiff's application for a prejudgment remedy in a case involving freedom of speech and first amendment principles. We disagree and affirm the judgment of the court.

In its memorandum of decision granting the plaintiff's application for a prejudgment remedy, the court made the following factual findings and credibility determinations. "[The plaintiff] is a forty-one year old [Black] woman. She suffers from Multiple Sclerosis (MS) and is immunocompromised. [The plaintiff] is a sexual assault survivor [and] . . . testified that stress and viral infections can produce an increase or flare-up of her MS condition. [The plaintiff] testified that two members of her family have died from MS. On January 6, 2021, [the plaintiff] attended a political protest at the Connecticut State Capitol building with her friend Melina Floyd-Torres. Both [the plaintiff] and . . . Floyd-Torres describe themselves as activists who frequently attend protests to demonstrate against racism and espouse the views of the Black Lives Matter movement and an organization called PowerUp CT. January 6, 2021, was the date that Connecticut state legislators were due to be sworn in for their new terms at the Capitol building. Neither [the plaintiff] nor . . . Floyd-Torres was involved in organizing the protest at the Capitol building on January 6. Nevertheless, [the plaintiff] and . . .

Floyd-Torres decided to attend the protest because they saw it as an opportunity to express their views to state legislators and to the public. Upon entering the Capitol grounds on January 6, [the plaintiff] and . . . Floyd-Torres made their way through the crowd to the north side front entrance to the Capitol building. While they were walking, and throughout the entire time period relevant to this memorandum of decision, [the plaintiff] and . . . Floyd-Torres were videotaping their actions and surroundings with their iPhones, as well as live streaming their actions and what they were seeing via Facebook. [The plaintiff] and . . . Floyd-Torres made their way to a metal 'bicycle' fence surrounding the exterior of the Capitol building. Upon arriving at the fencing, [the plaintiff] began using a bullhorn or megaphone to loudly shout slogans such as 'Black lives matter,' 'racism is a public health crisis,' and other similar statements.

"[The defendant] is an approximately forty year old Caucasian woman [and] . . . is Jewish. [The defendant] is originally from Lithuania but immigrated to the United States when she was a teenager shortly after the fall of the Soviet Union. [The defendant] experienced instances of persecution and antisemitism in the Soviet Union, and such experiences were among the reasons she immigrated to the United States. [The defendant] also has experienced antisemitism in the United States. [The defendant] has two young children, one of whom is a baby. [The defendant] supports the ideas of the medical freedom movement, which, as relevant to this memorandum of decision, generally opposes medical mandates such as required vaccinations and masking requirements. [The defendant] found out about the January 6 protest at the state Capitol building via Facebook and attended the protest in order to express her support for the ideas of the medical freedom movement.

"At the time [the plaintiff] and . . . Floyd-Torres began shouting their slogans, [the defendant] was also at the metal 'bicycle' fence and about twenty feet to [the right of the plaintiff] and . . . [Floyd-Torres] . . . . Four people separated [the defendant] from [the plaintiff] and . . . Floyd-Torres, who were standing together along the metal fence. At all times relevant to this memorandum of decision, [the defendant] was holding one of her children, a baby, who was strapped to the front of [the defendant], wrapped in a blanket, and facing inward.

"On the videos of the incident at issue, [the defendant] can be seen standing along the metal fence and looking in the direction of [the plaintiff] as [the plaintiff] shouts, 'Black lives matter' and similar slogans into her megaphone. Another protestor (not [the defendant]) can be heard on the video shouting, 'All lives matter.' After a short period of time (forty seconds or so), [the defendant] can be seen leaving her previous position at the metal fence and walking over to stand next to . . . Floyd-Torres. [The plaintiff] was standing next to . . . Floyd-Torres. At the prejudgment remedy hearing, [the defendant] testified that she moved toward . . . Floyd-Torres and [the plaintiff] because she was concerned that [the plaintiff's] loud shouts regarding Black Lives Matter were overshadowing what [the defendant] understood as the protest's intended purpose of espousing support for the medical freedom movement. The court credits [the defendant's] testimony on this point.

"The videos of the incident show that when [the defendant] walked over to stand next to . . . Floyd-Torres . . . Floyd-Torres was wearing a mask [and] [the plaintiff] was wearing a mask and glasses. [The defendant] was not wearing a mask. At this point, [the defendant] leaned over to . . . Floyd-Torres and asked . . . Floyd-Torres about 'Black on Black crime.' [The

plaintiff] responded that there is no such thing as 'Black on Black crime' and asked [the defendant] why she did not ask about 'white on white crime.'[1] [The defendant] responded that she is more of a minority than either . . . Floyd-Torres or [the plaintiff].[2] [The defendant] then used her hand to push . . . Floyd-Torres' megaphone away from [the defendant].[3] . . . Floyd-Torres and [the plaintiff] shouted through their megaphones at [the defendant] to back away from them. More words were exchanged between the parties. [The plaintiff] shouted through her megaphone at [the defendant] to 'back the fuck up' and remarked that [the defendant] was unmasked. [The plaintiff] continued shouting her slogans [and] . . . again shouted through her megaphone at [the defendant] to back up. . . . Floyd-Torres shouted through her megaphone at [the defendant] to back up and remarked that [the defendant] was unmasked and had a baby. [The defendant], who had essentially remained stationary since walking over to . . . Floyd-Torres' and [the plaintiff's] position, took a step forward toward the metal fence. [The plaintiff] again shouted through her megaphone at [the defendant] to back up and remarked that [the defendant]

---

[1] "The court accepted Professor Charles Gallagher as an expert on sociology and issues related to racism and criminal justice. Professor Gallagher testified that the phrases 'all lives matter' and 'Black on Black crime' can be seen as racist tropes indicating that individuals who use those phrases may hold racist attitudes. The court credits Professor Gallagher's testimony on these points."

[2] "[The defendant] testified that she was referring to her understanding that the Jewish population of the United States is smaller than the [Black] population of the United States. The court credits [the defendant's] testimony on this point. The court also credits the testimony of [the plaintiff] and . . . Floyd-Torres that they were unaware on January 6, 2021, that [the defendant] [is] Jewish."

[3] "[The defendant] testified that, given . . . Floyd-Torres' continued shouting through her megaphone, [the defendant] was concerned about potential damage to her child's hearing and that she and her views were being, in effect, shouted down. The court credits the second reason proffered by [the defendant] but not the first."

was unmasked. [The defendant] turned suddenly toward [the plaintiff], spat directly into [the plaintiff's] face, and walked away hurriedly.

"[The plaintiff] was struck by [the defendant's] spit on her mask, glasses, and megaphone. [The defendant] testified that she was spitting at [the plaintiff's] megaphone, not at [the plaintiff's] person. The court does not credit [the defendant's] testimony on this point. The court concludes, as a factual matter, that [the defendant] intended to spit at and on [the plaintiff]. [The plaintiff] testified that she experienced severe emotional distress as a result of being spat upon by [the defendant]. [The plaintiff] testified that she experienced severe emotional distress over increased concerns that she may contract COVID-19,[4] emotional distress over concerns that COVID-19 might worsen her MS, humiliation over being spat upon in public, and that the bodily violation of being spat upon reawakened the trauma of her past sexual assault. The court credits [the plaintiff's] testimony.[5]

"After [the defendant] spat on [the plaintiff] and walked away hurriedly, [the plaintiff] and . . . Floyd-Torres pursued [the defendant]. A small crowd began to form. Some members of the crowd appeared to want to protect [the defendant] from [the plaintiff] and . . . Floyd-Torres, while some members of the crowd appeared to want [the defendant] detained. In the midst of this somewhat chaotic scene, [the defendant] can be heard to say on the videotape, 'Get these crazy Black

---

[4] "The court takes judicial notice that COVID-19 can be transmitted through saliva. See https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19/basics-covid19.html."

We note that the website address visited by the trial court is no longer available. We also note, however, that "factual findings . . . are squarely within the trial court's purview [and] we afford them great deference." (Internal quotation marks omitted.) *Kazemi* v. *Allen*, 214 Conn. App. 86, 108, 279 A.3d 742 (2022), cert. denied, 345 Conn. 971, 286 A.3d 906 (2023).

[5] "The court credits the counseling bills submitted by [the plaintiff]. . . ."

Lives Matter activists away from me.' Police eventually arrived on the scene, and sometime later that day, [the defendant] was arrested. The time period between when [the defendant] approached [the plaintiff] and . . . Floyd-Torres and when [the defendant] spat on [the plaintiff] and walked away is approximately one minute." (Footnote altered; footnote omitted; footnotes in original.)

The plaintiff subsequently brought this action by filing an application for a prejudgment remedy along with a verified complaint. The verified complaint has four counts and alleges claims for assault, battery, intentional infliction of emotional distress, and intimidation based on bigotry or bias pursuant to General Statutes § 52-571c.[6] A remote hearing was held on the plaintiff's application over the course of four nonconsecutive days, at which the court took into evidence fourteen exhibits, which included three videos showing the incident at issue. Following the hearing, the court issued a memorandum of decision dated March 15, 2023, in

___

[6] General Statutes § 52-571c provides in relevant part: "(a) Any person injured in person or property as a result of an act that constitutes a violation of section 53a-181j, 53a-181k or 53a-181*l* may bring a civil action against the person who committed such act to recover damages for such injury.

"(b) In any civil action brought under this section in which the plaintiff prevails, the court shall award treble damages and may, in its discretion, award equitable relief and a reasonable attorney's fee. . . ."

Pursuant to General Statutes § 53a-181k (a), "[a] person is guilty of intimidation based on bigotry or bias in the second degree when such person maliciously, and with specific intent to intimidate or harass another person or group of persons motivated in whole or in substantial part by the actual or perceived race, religion, ethnicity, disability, sex, sexual orientation or gender identity or expression of such other person or group of persons, does any of the following: (1) Causes physical contact with such other person or group of persons . . . ."

Although the legislature has amended § 53a-181k since the events underlying this case; see Public Acts 2021, No. 21-78, § 18; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, all references herein are to the current revision of the statute.

which it granted the plaintiff's application for a prejudgment remedy in the amount of $295,239.60. In its decision, the court made probable cause findings as to each of the counts of the verified complaint. Specifically, with respect to the counts alleging assault and battery, the court found that there was probable cause that "[the defendant] committed a civil assault and battery against [the plaintiff]" when the defendant "caused her spit to land on [the plaintiff's] person." Next, the court found probable cause that the defendant "intentionally inflicted emotional distress on [the plaintiff]" when the defendant "intentionally spat in [the plaintiff's] face— an outrageous act that goes beyond all possible bounds of decency . . . ." The court further found that the defendant knew that what she had done would cause the plaintiff to suffer emotional distress, and that was "particularly so in the midst of a global pandemic wherein the deadly virus at issue can be transmitted to other persons through an infected person's saliva." The court specifically credited the plaintiff's testimony that she suffered emotional distress as a result of the incident.

Finally, the court made a finding that probable cause existed that "[the defendant] maliciously and intentionally harassed and intimidated [the plaintiff] by intentionally spitting in [the plaintiff's] face and that [the defendant's] actions in so doing were motivated, in whole or in substantial part, by [the plaintiff's] race. In making this finding, the court relie[d] on the following specific facts. [The plaintiff] is [Black]. [The defendant] is white. [The plaintiff] was actively expressing her support for the Black Lives Matter movement at the time in question. After hearing [the plaintiff] express her support for the Black Lives Matter movement, [the defendant] intentionally left her initial position at the metal fence and walked over to stand next to [the plaintiff]. Upon reaching [the plaintiff] and . . . Floyd-Torres, [the

defendant] immediately expressed her disagreement with [the plaintiff's] views by using what an expert witness testified is a racist trope—asking about so-called 'Black on Black crime.' Seconds later, [the defendant] spat on [the plaintiff]. Stated plainly, when a white person spits on a Black person while that Black person is expressing views in support of the Black Lives Matter movement, and the white person disputes those views by expressing a racist trope, a person of ordinary judgment would, at a minimum, entertain the idea that the white person's decision to spit on the Black person was motivated in substantial part by race." In reaching this conclusion, however, the court noted that it was not expressing a "view on whether the facts found by the court . . . meet the standard of preponderance of the evidence."

After considering any defenses, counterclaims or set-offs, the court concluded that the damages suffered by the plaintiff primarily were for emotional distress. It awarded the plaintiff a prejudgment remedy in the amount of $75,000 for emotional distress damages. In light of the court's finding of probable cause to sustain count four alleging a violation of § 52-571c, the court trebled the damages award to $225,000. Thereafter, the court concluded that there was probable cause that the plaintiff incurred $5700 in expenses when seeking counseling regarding the incident and trebled that amount, for a total of $17,100 in economic damages. Finally, the court awarded the plaintiff $53,139.60 in attorney's fees. The total amount of the prejudgment remedy awarded is $295,239.60. This appeal followed. Additional facts and procedural history will be set forth as necessary.

Before addressing the claims raised on appeal, we first set forth the law governing prejudgment remedies and our limited standard of review in such cases. "A prejudgment remedy means any remedy or combination

of remedies that enables a person by way of attachment, foreign attachment, garnishment or replevin to deprive the defendant in a civil action of, or affect the use, possession or enjoyment by such defendant of, his property prior to final judgment . . . . General Statutes § 52-278a (d). A prejudgment remedy is available upon a finding by the court that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff . . . . General Statutes § 52-278d (a) (1). . . . Proof of probable cause as a condition of obtaining a prejudgment remedy is not as demanding as proof by a fair preponderance of the evidence. . . . The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a [person] of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. . . . Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false. . . . Under this standard, the trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits. . . . *TES Franchising, LLC* v. *Feldman*, 286 Conn. 132, 136–37, 943 A.2d 406 (2008).

"Section 52-278d (a) explicitly requires that a trial court's determination of probable cause in granting a prejudgment remedy include the court's taking into account any defenses, counterclaims or set-offs . . . . Therefore, it is well settled that, in determining whether to grant a prejudgment remedy, the trial court must evaluate both parties' evidence as well as any defenses, counterclaims and setoffs. . . . Such consideration is

significant because a valid defense has the ability to defeat a finding of probable cause. . . . Id., 141.

"As for our standard of review, our Supreme Court has stated that an appellate court's role on review of the granting of a prejudgment remedy is very circumscribed. . . . In its determination of probable cause, the trial court is vested with broad discretion which is not to be overruled in the absence of clear error. . . . Since *Augeri* [v. *C. F. Wooding Co.*, 173 Conn. 426, 429, 378 A.2d 538 (1977)] . . . we have consistently enunciated our standard of review in these matters. In the absence of clear error, this court should not overrule the thoughtful decision of the trial court, which has had an opportunity to assess the legal issues which may be raised and to weigh the credibility of at least some of the witnesses. . . . [On appeal], therefore, we need only decide whether the trial court's conclusions were reasonable under the clear error standard. . . . *TES Franchising, LLC* v. *Feldman*, supra, 286 Conn. 137–38. Additionally, we do not conduct a plenary review of the merits of defenses . . . raised, but rather our review is confined to a determination of whether the trial court's finding of probable cause constitutes clear error." (Emphasis omitted; internal quotation marks omitted.) *Konover Development Corp.* v. *Waterbury Omega, LLC*, 214 Conn. App. 648, 657–58, 281 A.3d 1221, cert. denied, 345 Conn. 919, 284 A.3d 627 (2022).

I

The defendant's first claim is that the court improperly awarded the plaintiff a prejudgment remedy in the amount of $75,000 for emotional distress. Specifically, the defendant argues that there is little to no evidence supporting the plaintiff's claim of emotional distress "other than [her] self-serving statements [as] an activist," which were not sufficient to meet her burden of establishing the extent of her damages. We do not agree.

The following additional facts are relevant to the defendant's claim. In its memorandum of decision, the court stated that, "[i]n setting an appropriate initial emotional distress damage amount, [it] relie[d] on the following facts. [The plaintiff] was spat upon in public. The court also [found], as set forth [previously], that [the plaintiff] was spat upon because she is [Black]. The court credit[ed] [the plaintiff's] testimony that these events are deeply humiliating to [her], caused [her] severe emotional distress, and reawakened trauma related to a prior sexual assault. Additionally, [the plaintiff] is immunocompromised as a result of her MS diagnosis, and, on January 6, 2021, Connecticut was still in the midst of the COVID-19 pandemic. COVID-19 can be spread by saliva, and a COVID-19 diagnosis for [the plaintiff] would not only be emotionally distressing in and of itself but especially so for [the plaintiff] because COVID-19 could aggravate [the plaintiff's] preexisting MS, a disease that [she] had seen kill two of her family members. [The plaintiff] also had to wait a period of time before a test could confirm [that] she was COVID-19 negative."

We next set forth general legal principles that guide our resolution of this claim. "Generally, a trial court [must] make a probable cause determination as to both the validity of the plaintiff's claim and the amount of the remedy sought . . . ." (Internal quotation marks omitted.) *J.E. Robert Co.* v. *Signature Properties, LLC*, 309 Conn. 307, 339, 71 A.3d 492 (2013). In the present case, the defendant's claim as to the emotional distress damages concerns the latter. "[A]lthough the likely amount of damages need not be determined with mathematical precision . . . the plaintiff bears the burden of presenting evidence [that] affords a reasonable basis for measuring her loss . . . ." (Internal quotation marks omitted.) Id., 339–40; see also *Burkert* v. *Petrol Plus of Naugatuck, Inc.*, 5 Conn. App. 296, 301, 497

A.2d 1027 (1985) ("damages need not be established with precision but only on the basis of evidence yielding a fair and reasonable estimate" (internal quotation marks omitted)). Moreover, trial courts have "broad legal discretion in awarding emotional distress damages"; *Commission on Human Rights & Opportunities ex rel. Cortes* v. *Valentin*, 213 Conn. App. 635, 656, 278 A.3d 607, cert. denied, 345 Conn. 962, 285 A.3d 389 (2022); and in our very limited review of the granting of a prejudgment remedy, we are mindful that the trial court, "[i]n its determination of probable cause . . . is vested with broad discretion which is not to be overruled in the absence of clear error." (Internal quotation marks omitted.) *TES Franchising, LLC* v. *Feldman*, supra, 286 Conn. 137. We, therefore, do not examine the court's decision under an abuse of discretion standard but, rather, "need only decide whether the trial court's conclusions were reasonable under the clear error standard." (Internal quotation marks omitted.) Id., 138. "[T]he clear error standard in this context is a heightened standard of deference that exceeds the level of deference afforded under the abuse of discretion standard. Therefore, this court will overrule the trial court's determination on a prejudgment remedy only if we are left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *Calco Construction & Development Co.*, 141 Conn. App. 40, 50, 60 A.3d 983 (2013).

In *Giordano* v. *Giordano*, 39 Conn. App. 183, 664 A.2d 1136 (1995), this court explained that "[a]n award of damages for emotional distress may be valid even though it is not substantially based on incurred medical expenses. *Berry* v. *Loiseau*, 223 Conn. 786, 811, 614 A.2d 414 (1992). A plaintiff may recover damages in a personal injury action for pain and suffering *even when such pain and suffering is evidenced exclusively by*

*the plaintiff's subjective complaints.* . . . [There is] no reason to subject a claim of mental suffering, which is ordinarily evidenced by subjective complaints, to stricter scrutiny or greater care than a claim of physical suffering evidenced by the same type of complaints. . . . Plaintiffs claiming damages as a result of emotional distress are *not* required to present expert medical testimony or psychiatric bills to substantiate their claims of noneconomic damages such as pain and suffering. . . . This rule also applies to other areas of tort law where noneconomic damages are claimed. See, e.g., *Harris* v. *Forklift Systems, Inc.*, 510 U.S. 17, [22, 25], 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (holding that in cases alleging discriminatory work environment, there cannot be a mathematically precise test, noting in concurrence that the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. . . . It suffices to prove that a reasonable person subjected to the discriminatory conduct would feel as the plaintiff did . . . . [Ginsberg, J., concurring])." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Giordano* v. *Giordano*, supra, 207–208. As a result, we rejected a claim of the defendant in that case "that because noneconomic damages cannot be estimated as precisely as economic damages, prejudgment remedies are inappropriate in emotional distress cases. The defendant's case is not, as he implies, the first case where a prejudgment remedy has been awarded in a claim for noneconomic damages. The very nature of some civil claims *makes the amount of a prejudgment remedy award a reasonable estimation rather than an estimation of reasonable certainty.*" (Emphasis added.) Id., 208.

Similarly, in *Commission on Human Rights & Opportunities ex rel. Cortes* v. *Valentin*, supra, 213 Conn. App. 654–56, this court rejected a claim that there

was insufficient evidence to support an award of emotional distress damages when the award was based on the testimony of the intervening plaintiff alone. In doing so, we noted that, "[i]n garden variety emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff." (Internal quotation marks omitted.) Id., 655; see also *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 707, 41 A.3d 1013 (2012) (same).

"Viewing the evidence before the court in the light most favorable to the plaintiff"; *Alpha Beta Capital Partners, L.P.* v. *Pursuit Investment Management, LLC*, 193 Conn. App. 381, 453, 219 A.3d 801 (2019), cert. denied, 334 Conn. 911, 221 A.3d 446 (2020), and cert. denied, 334 Conn. 911, 221 A.3d 446 (2020); as we are required to do, we conclude that the court's prejudgment remedy award of damages for emotional distress was not clear error. Although the defendant describes as self-serving the plaintiff's testimony concerning the humiliating nature of the incident and the emotional distress she claims to have suffered as a result, the court specifically found credible the plaintiff's testimony that she experienced severe emotional distress as a result of being spat upon by the defendant and due to increased concerns that she may contract COVID-19 and that contracting COVID-19 might worsen her MS. The court also found credible her testimony that she felt "humiliation over being spat upon in public, and that the bodily violation of being spat upon reawakened the trauma of her past sexual assault."[7] It is not the role of an appellate

---

[7] Specifically, the plaintiff testified that her "biggest triggers" for her MS "are stress." When asked what are the emotional and physical reactions that she has suffered since the incident, she responded, "a lot of crying . . . [a] lot of embarrassment . . . [a] lot of public humiliation." She also described being in "[a] lot of physical pain" starting about a week after the incident when she "started noticing patches of [her] hair coming out in different parts of [her scalp]," and that she believed it was from stress. As a result, she went to her doctor, who diagnosed her with shingles. Thereafter, she suffered a flare-up of her MS. Further, the plaintiff testified that she

court to disturb that credibility determination. See *Companions & Homemakers, Inc.* v. *A&B Homecare Solutions, LLC*, 348 Conn. 132, 148, 302 A.3d 283 (2023) ("[i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony" (internal quotation marks omitted)); *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, 346 Conn. 564, 594 n.9, 294 A.3d 1 (2023) ("[The trial] court, as the trier of fact and thus the sole arbiter of credibility, was free to accept or reject, in whole or in part, the testimony offered by either party. . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review." (Citation omitted; internal quotation marks omitted.)). Moreover, the court reasonably could have inferred from that testimony that her emotional distress resulted from the incident with the defendant. See *Commission on Human Rights & Opportunities ex rel. Cortes* v. *Valentin*, supra, 213 Conn. App. 655 ("[i]t is the right of the trier of fact to draw reasonable and logical inferences from the facts that it finds to be proved" (internal quotation marks omitted)).

The plaintiff's testimony, therefore, afforded a reasonable basis for the prejudgment remedy of $75,000 in emotional distress damages. See *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 448, 815 A.2d 119 (2003) (jury reasonably could have concluded that plaintiff suffered emotional distress on basis of plaintiff's testimony that "he could not sleep, had frequent nightmares, had a loss of appetite, and experienced depression and a sense of isolation from his community because of the investigation" by defendant insurer into origins of fire at plaintiff's home); *Iino* v. *Spalter*, 192 Conn. App. 421, 477–78, 218 A.3d 152 (2019) ("[a] plaintiff may recover damages in a personal injury action for pain and suffering even

has incurred expenses for therapy needed related to the incident, and that the incident felt like "attempted murder" to her.

when such pain and suffering is evidenced exclusively by the plaintiff's subjective complaints" (internal quotation marks omitted)). As the plaintiff established a reasonable basis for the court's conclusions regarding emotional distress, its decision to award a prejudgment remedy of $75,000 for emotional distress was not clear error.

II

The defendant's next claim concerns the court's admission of expert testimony from Charles A. Gallagher, a professor of sociology and criminal justice at LaSalle University, concerning issues of race and the racial import of certain statements made by the defendant—specifically, the defendant's statement that "all lives matter" and reference to "Black on Black crime." First, the defendant argues that Gallagher's testimony should not have been admitted into evidence because Gallagher, as a nonscientific expert, did not have any special skill or knowledge directly applicable to the matter in issue, which concerned the defendant's intent at the time she spat on the plaintiff, he "had nothing but attenuated general knowledge of the discussion of race in the United States," and he offered no meaningful assistance to the court given that his testimony shed no light on the defendant's intent. Second, the defendant argues that there was no evidence that the defendant's statements "were inspired by racial animus other than the highly conjectural and virtually meaningless testimony of [Gallagher]," whose testimony should not have been permitted, and that, in the absence of that testimony, the plaintiff offered no evidence establishing that the defendant's conduct was motivated by a specific intent to intimidate and harass the plaintiff on account of her race, as required to treble the damages under § 52-571c. We disagree with both claims and address them in turn.

A

The following additional facts are relevant to the defendant's claim concerning the admission of Gallagher's testimony. Following the first two days of the hearing on the plaintiff's application for a prejudgment remedy, the defendant filed a motion on July 1, 2022, to preclude Gallagher's expert testimony. The court denied the motion in a written order dated July 25, 2022. In that order, the court determined that the proffered expert testimony was not scientific in nature[8] and, thus, was subject to admissibility under the standard set forth in *Weaver* v. *McKnight*, 313 Conn. 393, 405–406, 97

---

[8] In her motion to preclude the expert testimony, the defendant also requested a hearing pursuant to *State* v. *Porter*, 241 Conn. 57, 80–90, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), to determine the admissibility of the proffered expert testimony. In *Porter*, our Supreme Court "followed the United States Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and held that testimony based on scientific evidence should be subjected to a flexible test to determine the reliability of methods used to reach a particular conclusion. . . . A *Porter* analysis involves a two part inquiry that assesses the reliability and relevance of the witness' methods." (Internal quotation marks omitted.) *State* v. *Raynor*, 337 Conn. 527, 529 n.2, 254 A.3d 874 (2020). The trial court in the present case denied the defendant's request, concluding that, because Gallagher's testimony was not scientific in nature, no *Porter* hearing was required. In her appellate brief, the defendant makes a passing reference to the court's determination that Gallagher's testimony was not scientific in nature and asserts that it constituted clear error. In her appellate brief, the plaintiff asserts that the defendant's claim that a *Porter* hearing was required is inadequately briefed. We agree with the plaintiff. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *In re Javonte B.*, 226 Conn. App. 651, 653 n.2,      A.3d      (2024). The defendant has provided only a cursory analysis in a few sentences with no citation to authority supporting her assertions that the testimony was scientific in nature and that the court committed clear error. Accordingly, we decline to review the claim. See *In re A. H.*, 226 Conn. App. 1, 31 n.23, 317 A.3d 197 (declining to review claim that was inadequately briefed), cert. denied, 349 Conn. 918, 317 A.3d 784 (2024).

A.3d 920 (2014). After applying that standard, the court stated: "[T]he court finds . . . Gallagher is an expert in racial justice, racial criminal justice and related topics based on the curriculum vitae and report attached to [the plaintiff's] expert disclosure. . . . Because [the plaintiff] seeks treble damages pursuant to . . . § 52-571c for intimidation based on racial bigotry or bias, the possible racial import of [the defendant's] words and/or actions are directly relevant to the amount of the prejudgment remedy the court may order. Thus, the issue becomes whether any testimony . . . Gallagher might be qualified to offer would be helpful to the determination of an issue to be decided by the fact finder, here, the court. The court concludes that, in this case, the answer to that question is 'yes.'

"In setting an appropriate amount of a prejudgment remedy, the court is required to determine, based on a standard of probable cause, whether [the defendant's] words and/or actions are based on racial bigotry or bias. At the June 16, 2022 hearing on this matter, there was testimony to the effect that [the defendant] used the phrase 'all lives matter' in response to [the plaintiff's] use of the phrase 'Black Lives Matter.' Additionally, at the June 16, 2022 hearing, there was testimony to the effect that [the defendant] made statements regarding 'Black on Black crime' in response to [the plaintiff's] statements. In the exercise of its discretion to admit trial testimony, the court concludes that it would be helpful to the court to hear expert testimony as to whether any statements or actions by [the defendant] may exhibit a racial bigotry or bias." (Citation omitted.)

The test for admitting nonscientific expert testimony was set forth by our Supreme Court in *Weaver* v. *McKnight*, supra, 313 Conn. 405–406. Under that test, "[e]xpert testimony should be admitted when: (1) the

witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . [Id.] We review a trial court's decision to [admit] expert testimony for an abuse of discretion. . . . We afford our trial courts wide discretion in determining whether to admit expert testimony and, unless the trial court's decision is unreasonable, made on untenable grounds . . . or involves a clear misconception of the law, we will not disturb its decision." (Internal quotation marks omitted.) *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, 171 Conn. App. 61, 110, 156 A.3d 539 (2017), aff'd, 333 Conn. 343, 216 A.3d 629 (2019).

In the present case, applying the test set forth in *Weaver*, we conclude that the court did not abuse its wide discretion in admitting Gallagher's testimony. As to the first prong of *Weaver*, Gallagher is a professor of sociology with an expertise on issues related to race and criminal justice, and the court explicitly accepted Gallagher as an expert on those issues. See footnote 1 of this opinion. Because the plaintiff sought treble damages pursuant to § 52-571c for intimidation based on racial bigotry or bias, the court determined that testimony by Gallagher concerning the possible racial import of the defendant's words and/or actions would be directly relevant to the amount of any prejudgment remedy ordered by the court. Accordingly, Gallagher had special knowledge that was directly applicable to the matter at issue.

Second, after the court accepted Gallagher as an expert in sociology and racial justice, Gallagher testified regarding his knowledge of the sociological significance

of the Black Lives Matter and All Lives Matter[9] movements, as well as literature regarding "Black on Black crime." He further testified regarding hallmarks of racist tropes and differentiating between racism, bias, and bigotry, and the historical conditions that were relevant to the circumstances in the present case. Although the defendant claims that Gallagher offered "nothing but attenuated general knowledge of the discussion of race in the United States" and that his "expertise is of a watercooler variety," his testimony and academic credentials belie such a claim. There is a difference between Gallagher's academic experience in these fields and the knowledge that the average person might have. Gallagher offered the court a historical and sociological perspective on race and racism that not only helped inform the court's conclusion regarding racial animus but would not have been within the knowledge of the average person, despite their own experience with these concepts. We conclude, therefore, that Gallagher's testimony is not common to the average person.

Finally, as to the third prong of *Weaver*, the court specifically found that, given Gallagher's background in racial criminal justice, his testimony would be helpful to the court in its determination of whether the defendant's words and/or actions were primarily motivated by race, which was directly relevant to the amount of the prejudgment remedy ordered by the court. As the defendant points out, Gallagher could not and did not provide testimony as to what the defendant's specific intent or motivation was during the incident; his testimony, however, provided context for how the defendant's statements could be construed, which the court found to be helpful in its determination of whether the

---

[9] Gallagher testified that the research he had seen shows that "people [who] embrace the moniker 'all lives matter' tend to have certain ideas about race. They tend to be more anti-Black."

defendant exhibited racial bigotry or bias. Moreover, the defendant's challenges to the admission of Gallagher's testimony in part concern the substance of his conclusions, which relates more to the weight that his testimony should be given, not its admissibility. See *Kohl's Dept. Stores, Inc.* v. *Rocky Hill*, 219 Conn. App. 464, 490–91, 295 A.3d 470 (2023). Accordingly, we conclude that it was not an abuse of the court's discretion to admit Gallagher's testimony.

B

The defendant next claims that there was no evidence that her statements "were inspired by racial animus other than the highly conjectural and virtually meaningless testimony of [Gallagher]," whose testimony should not have been permitted, and that, in the absence of that testimony, the plaintiff offered no evidence establishing that the defendant's conduct was motivated by a specific intent to intimidate and harass the plaintiff on account of her race, as required to treble the damages under § 52-571c. We first find this claim unavailing in light of our determination that the admission of Gallagher's testimony was not improper. Second, in its memorandum of decision, the court referred to Gallagher's testimony "that the phrases 'all lives matter' and 'Black on Black crime' can be seen as racist tropes indicating that individuals who use those phases may hold racist attitudes," and credited his testimony on those points. "[T]he trial court is free to accept or reject, in whole or in part, the evidence presented by any witness, having the opportunity to observe the witnesses and gauge their credibility. . . . This court defers to the trial court's discretion in matters of determining credibility and the weight to be given to a witness' testimony." (Internal quotation marks omitted.) *L. K.* v. *K. K.*, 226 Conn. App. 279, 309–10,     A.3d     (2024).

Nevertheless, even without Gallagher's testimony, there was other evidence before the court to support its

determination that there was probable cause to believe that the defendant's actions and/or statements were motivated by race. First, the court viewed video recordings of the incident, which showed that the defendant left her initial position and walked over to the plaintiff and stood by her. This occurred right after the plaintiff began expressing her support for the Black Lives Matter movement by shouting into her megaphone, "Black Lives Matter" and similar slogans. Although the court credited the defendant's testimony that the reason she moved toward the plaintiff was because "she was concerned that [the plaintiff's] loud shouts regarding Black Lives Matter were overshadowing what [the defendant] understood as the protest's intended purpose of espousing support for the medical freedom movement," the exchange between the plaintiff and the defendant quickly became contentious when the defendant expressed disagreement with the plaintiff's views and asked her about "Black on Black crime." That was compounded by the fact that the defendant used the phrase "all lives matter,"[10] which, in combination with the defendant's question about "Black on Black crime," could suggest a level of racial animus on behalf of the defendant. Given these circumstances, the court reasonably could have determined that a person of ordinary judgment could conclude that the conduct of the defendant, a white woman, in spitting on the plaintiff, a Black woman, was motivated in substantial part by race.

---

[10] "The phrase 'All Lives Matter' gained popularity in response to the growth of the Black Lives Matter movement . . . a social movement protesting violence against Black individuals and communities, with a focus on police brutality." *B.B.* v. *Capistrano Unified School District*, Docket No. 8:23-CV-00306 (DOC/ADS), 2024 WL 1121819, *4 n.4 (C.D. Cal. February 22, 2024). " '[A]ll [L]ives [M]atter' " can be seen as an offensive response to Black Lives Matter because that phrase obscures "the fact that [B]lack people have not yet been included in the idea of 'all lives.' " D. Victor, "Why 'All Lives Matter' is Such a Perilous Phrase," (July 15, 2016), available at https://www.nytimes.com/2016/07/16/us/all-lives-matter-black-lives-matter.html (last visited August 8, 2024).

The defendant is correct that, for the plaintiff to receive treble damages under § 52-571c following a trial of this matter, she must establish at trial that, when the defendant spit on the plaintiff, she did so with the specific intent to intimidate or harass the plaintiff and was motivated in whole or in substantial part by the plaintiff's race. See General Statutes § 53a-181k (a). General Statues § 53a-3 (11) provides that "[a] person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ." It follows that, at a trial on this matter, the plaintiff will have to establish, by a preponderance of the evidence, that the defendant's motivation and intent during the incident meet those requirements. The present case, however, involves an application for a prejudgment remedy, under which the evidentiary standard is that of probable cause, which is lower than the preponderance of the evidence standard that must be met at trial. See *TES Franchising, LLC* v. *Feldman*, supra, 286 Conn. 137 (" '[p]roof of probable cause as a condition of obtaining a prejudgment remedy is not as demanding as proof by a fair preponderance of the evidence' ").

As we have stated, "a prejudgment remedy hearing is not contemplated to be a full scale trial on the merits, which necessarily will mean that the evidence presented at the hearing will not be as well developed as it would be at trial . . . ." Id., 143. At such a hearing, a plaintiff need only establish "that there is probable cause to sustain the validity of the claim"; (internal quotation marks omitted) *Calfee* v. *Usman*, 224 Conn. 29, 37, 616 A.2d 250 (1992); and the probable cause standard "does not demand that a belief be correct or more likely true than false." (Internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *Calco Construction & Development Co.*, supra, 141 Conn.

App. 49. In fact, the trial court in the present case noted that it was not expressing a "view on whether the facts found by the court . . . meet the standard of preponderance of the evidence."

As previously stated in this opinion, probable cause, for purposes of an application for a prejudgment remedy, "is a flexible and common sense standard." (Internal quotation marks omitted.) *TES Franchising, LLC* v. *Feldman,* supra, 286 Conn. 137. "The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a [person] of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." (Internal quotation marks omitted.) Id. In the present case, the court applied that standard and determined that there was probable cause to conclude that the defendant violated §§ 52-571c and 53a-181k, which supported its determination to treble the damages. Viewing the evidence before the court in the light most favorable to the plaintiff, we conclude that it was not clear error for the court to find that there was probable cause to conclude that the defendant's actions were motivated in whole or substantial part by the plaintiff's race.

### III

The defendant's final claim is that the court committed plain error in granting the plaintiff's application for a prejudgment remedy in a case involving freedom of speech and first amendment principles. The defendant argues that, "given the importance of freedom of speech and expression in the United States, decisions involving speech acts ought to be decided by juries, and not, as here—even in the limited fashion afforded by a prejudgment remedy—in a preliminary hearing decided by a judge." The defendant acknowledges that this claim is unpreserved and raises it pursuant to the plain error

doctrine. In making the claim, the defendant relies on the decision of the United States Supreme Court in *Counterman* v. *Colorado*, 600 U.S. 66, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023), which is a case involving true threats of violence. In *Counterman*, "[t]he question presented [was] whether the [f]irst [a]mendment still requires proof that the defendant had some subjective understanding of the threatening nature of his statements." Id., 69. In holding that it does, the court explained that "a mental state of recklessness is sufficient," and that "[t]he [s]tate must show that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence. The [s]tate need not prove any more demanding form of subjective intent to threaten another." Id. According to the defendant, the trial court in the present case "applied an objective standard in determining the intent of the defendant when making what the plaintiff's expert contend[ed] were racially charged comments. These comments were used to infer the intent behind the spitting. . . . [T]his use of an objective standard is unsustainable under *Counterman* . . . [and] it should be a jury, not the court, that decides an issue penalizing political speech."

The plaintiff counters that "the words a person utters are properly used as evidence to determine intent and motive" and that, nonetheless, "spit is not speech" and the present case is not a threatening speech case. The plaintiff further asserts that "the defendant was not arrested for shouting 'All lives matter' or 'Black on Black crime.' . . . She . . . is being sued for assaulting the plaintiff with bodily fluids," and that, even though her "words were . . . used as evidence of motive," that was "entirely appropriate." In support of this claim, the plaintiff relies on *Wisconsin* v. *Mitchell*, 508 U.S. 476, 489, 113 S. Ct. 2194, 124 L. Ed. 2d 436 (1993), in which the United States Supreme Court held that "[t]he [f]irst

[a]mendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like."

We begin with a brief discussion of the plain error doctrine. "The plain error doctrine is based on Practice Book § 60-5, which provides in relevant part: The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . . The plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under [the] plain error [doctrine] unless [he] has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, 225 Conn. App. 552, 572 n.26, 316 A.3d 742 (2024). "[The plain error] doctrine . . . is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. . . . [T]he plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly." (Internal quotation marks omitted.) *M. C.* v. *A. W.*, 226 Conn. App. 444, 448 n.4,      A.3d      (2024). The defendant cannot prevail on her claim under the plain error doctrine unless she demonstrates "the existence of an error that is obvious

in the sense of not debatable. . . . [T]his inquiry entails a relatively high standard, under which it is not enough for the defendant simply to demonstrate that [her] position is correct. Rather, the party seeking plain error review must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal." (Internal quotation marks omitted.) *Marafi* v. *El Achchabi*, 225 Conn. App. 415, 438, 316 A.3d 798 (2024). On the basis of the record before us and for the following reasons, we conclude that the defendant has not "met the stringent standard for relief pursuant to the plain error doctrine." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 572 n.26.

First, the defendant's reliance on *Counterman* is misplaced, as the facts of *Counterman* easily differentiate it from the present case. In *Counterman*, a defendant sent Facebook messages to a woman over a period of two years, some of which "envisaged harm befalling her . . . ." *Counterman* v. *Colorado*, supra, 600 U.S. 70. The messages caused the woman to be fearful she would get hurt and to suffer from severe anxiety. Id. The defendant was charged criminally under a Colorado statute that makes "it unlawful to [r]epeatedly . . . make . . . any form of communication with another person in a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person . . . to suffer serious emotional distress." (Internal quotation marks omitted.) Id. After the defendant was convicted, he appealed, eventually to the United States Supreme Court, which held that, although "[t]rue threats of violence . . . lie outside the bounds of the [f]irst [a]mendment's protection"; id., 72; the first amendment nevertheless requires the state to "prove in true-threats cases that the defendant had some understanding of his statements' threatening character." Id., 73. In contrast, the present case involves allegations

against the defendant for her *conduct* in spitting on the plaintiff, not for a verbal threat. The defendant's statements, made just prior to the spitting incident, were used by the court solely to help determine her intent at the time of the incident and whether she was motivated in whole or part by the plaintiff's race, which is consistent with *Wisconsin* v. *Mitchell,* supra, 508 U.S. 489; crucially, they were not construed as conduct *in and of themselves.* Nor can the defendant's statements be characterized as true threats of violence, which are " 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence,' " and "subject individuals to 'fear of violence' and to the many kinds of 'disruption that fear engenders.' " *Counterman* v. *Colorado,* supra, 74.

Moreover, the defendant's argument that the prejudgment remedy hearing should have been decided by a jury, not the court, because first amendment issues are implicated is equally unavailing. The defendant provided no authority in support of this assertion. Prejudgment remedies are governed by statute. See General Statutes § 52-278a et seq. Those statutes specifically require that an application for a prejudgment remedy be directed to the Superior Court; General Statutes § 52-278c; and that a party shall have a right to a hearing on such application, which is limited to a determination by a court of certain factors. General Statutes § 52-278d. There are no exceptions within the relevant statutes for cases involving first amendment issues. Consequently, the defendant has not demonstrated "that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal"; (internal quotation marks omitted) *Marafi* v. *El Achchabi,* supra, 225 Conn. App. 438; and her plain error claim, therefore, fails.

The judgment is affirmed.

In this opinion the other judges concurred.